## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DANIEL J. KEY,
       Plaintiff

                                       Case No. 1:09-cv-139

    vs
                                      Spiegel, J.
                                      Litkovitz, M.J.

CINCINNATI HAMILTON COUNTY      **REPORT AND**
COMMUNITY ACTION AGENCY,        **RECOMMENDATION**
       Defendant

This matter is before the Court on defendant Cincinnati Hamilton County Community Action Agency's Motion for Summary Judgment (Doc. 28), plaintiff Daniel J. Key's response in opposition (Doc. 29), and defendant's reply memorandum. (Doc. 30).

## I. Introduction

Plaintiff filed the complaint in this action pro se. (Doc. 3).[1] He brings this action pursuant to the Court's original jurisdiction for violation of the federal anti-discrimination laws. Plaintiff also brings state claims under the Court's supplemental jurisdiction. Plaintiff's complaint states both that he is a 46 year old African American individual (*Id.* at ¶ 4) and that he is a 42 year old African American male. (*Id.* at § V, ¶ 5). The complaint alleges that in November 2007, plaintiff was subjected to a hostile work environment and disparate treatment by defendant Cincinnati Hamilton County Community Action Agency (C-HCCAA) because of his race, sex and age (*Id.*); he was demoted without good cause and replaced by a younger female with less or no experience in his department (*Id.* at 6); and he was unlawfully discharged. (*Id.* at

---

[1]Counsel has since entered an appearance on plaintiff's behalf.

7).

Plaintiff also claims that he was discriminated against in retaliation for "his previous civil rights complaints." (*Id*. at ¶ 8). Plaintiff alleges that he made a timely charge with the Equal Employment Opportunity Commission (EEOC) on or about November 28, 2007, complaining of all of the unlawful employment actions alleged in the complaint (*Id*. at ¶ 2); he received a notice of right to sue from the EEOC dated November 25, 2008 (*Id*. at ¶ 2; Att. A); after defendant received notice that plaintiff had instituted "charges" with the EEOC, he was discharged from his position (*Id*. at ¶ 3); although the discharge notice stated that plaintiff's resignation had been accepted, plaintiff had not resigned (*Id*.); plaintiff filed a charge of retaliation against defendant (*Id*.); and plaintiff received a notice of right to sue dated November 25, 2008. (*Id*. at Att. B).[2] As relief, plaintiff seeks $500,000 in compensatory damages; $2,000,000 in punitive damages; and attorney fees, costs, and such additional relief as the Court deems proper and just. (*Id*. at § VIII).

## II. Undisputed Facts

C-HCCAA is an agency that provides various support services, including home energy efficiency services, to low-income individuals and families throughout Hamilton County, Ohio, at little or no cost to the recipients. (Doc. 28-1, Gwen Robinson Aff., ¶¶ 3, 6). C-HCCAA is divided into six separate departments - Community Services, Youth Services, Home Energy Assistance Program (HEAP), Weatherization, Microenterprise Initiative, and Head Start. (*Id*. at ¶ 7). HEAP assists individuals who cannot afford to pay their energy bills by setting up income-based payment programs with their utility company. (Doc. 27, Key depo. at 59-60). Weatherization qualifies individuals for home weather-proofing and energy efficiency services.

---

[2]Plaintiff apparently filed two complaints with the EEOC as there are two notices of right to sue attached to the complaint.

(*Id*. at 64-65; Robinson Aff. at ¶ 8).

Plaintiff began his employment at C-HCCAA in HEAP in an intake/outreach position, which was an hourly, non-management position. (Key depo. at 58, 64). Plaintiff's duties included visiting homes and sites of potential applicants ("outreach") and meeting with potential applicants at C-HCCAA to evaluate their eligibility for the program ("intake"). (*Id*., at 58, 60). In April 1999, plaintiff was transferred to an intake/outreach position in Weatherization, which was likewise an hourly, non-management position. (*Id*. at 63-64). In that position, plaintiff continued to perform the same intake/outreach duties he had performed in HEAP. (*Id*. at 65). At some point, plaintiff's title changed to Energy Educator. (*Id*. at 67). He remained an hourly, non-management employee. (*Id*. at 68). His responsibilities as Energy Educator included teaching individuals how to save on their utility bills and analyzing energy efficiency in homes of the elderly and disabled. (*Id*. at 67). Plaintiff was the only individual in that program, although an intake/outreach employee sometimes assisted with names and addresses. (*Id*. at 68).

In March 2006, plaintiff applied for the position of Operations Manager in Weatherization and was selected for the position. (*Id*. at 70-71). His duties included supervising the intake/outreach support staff; administering all purchases of materials, tools, equipment and supplies; producing monthly production reports for submission to a State department; monitoring program expenditures; managing client complaints in a professional and courteous manner; and performing other duties that might be assigned to him. (*Id*. at 72-75). This position was the first management position plaintiff had held with C-HCCAA. (*Id*. at 76).

Plaintiff received his first evaluation for his performance as Operations Manager on March 20, 2007, for the period January 1, 2006 to December 31, 2006. (*Id*. at 77-78, 83). The

3

evaluation was completed by Karen Dudley, the Human Resources Manager at the time. (*Id*. at

78, 79; Exh. 1). Plaintiff received five out of ten possible points in all ten performance areas

which were rated on the evaluation. (*Id*., Exh. 1). The evaluation included several positive

comments, including that plaintiff took the initiative to improve Weatherization on a voluntary

basis; he showed enthusiasm for the job; he appropriately used Agency resources; and he showed

a willingness to assist individuals in other departments. (*Id*.). The evaluation also contained

numerous criticisms of plaintiff's performance. (*Id*.; Key depo. at 79). Among the criticisms

were that plaintiff's failure to plan or focus on his tasks adversely impacted his performance; he

did not display his knowledge of a new program on which he had trained in 2006; he exhibited

an inability to adapt to change with which he did not agree; he displayed average effort toward

meeting his goals; he wandered throughout the agency and off-premises, thereby requiring

additional supervision; his communication at times was negative and sometimes created tension;

and there were incidents where he did not work to achieve departmental goals. (*Id*., Exh. 1). The

evaluation noted that plaintiff's willingness to assist others was a strength and outlined three

goals for the next evaluation period: (1) master knowledge of the "Duke" program; (2) be

accountable for work time; and (3) plan and organize work tasks to meet departmental goals.

(*Id*.).

In February 2007, Doug Misenheimer became the Director of Weatherization and

plaintiff's immediate supervisor. (*Id*., Exh. 11). At this time, the management team in

Weatherization consisted of three managers, all of whom reported to Misenheimer: (1) plaintiff,

the Operations Manager; (2) William Reed, the Production Manager; and (3) Donnie

Washington, the HVAC Coordinator. (*Id*. at 100-101). When Misenheimer became Director,

4

Weatherization was not meeting its monthly quota of units, or production numbers, which is the state-mandated number of applications for its services the department must meet in order to continue to receive state funding and maintain its grants. (*Id*. at 97; Robinson Aff. at ¶ 9).  For the entire period of 2007, Weatherization did not attain its production numbers and the department was not performing at an acceptable level. (Key depo. at 99, 151-152).

Misenheimer sent an email to plaintiff in June 2007 regarding the need to turn the production numbers around quickly. (*Id*., Exh. 3).  On July 28, 2007, Misenheimer sent an email to plaintiff, Washington and Reed regarding the department's failure to meet the productions numbers. (*Id*., Exh. 4).  The email states in part:

> [W]e are -26 units in the hole...At July's reporting we are to be at 100% or we loose [sic] revenue and go on reimbursement.  This is un-avoidable at this point... It is essential that production be made.  It is not one individual[']s fault.  Everyone has not given 110% effort...If production is not met I feel I have no choice than to place the management team if not the whole department on probation.  Which means that eventually either job descriptions and/or demotions or new staff will be brought in.

*Id*. Plaintiff understood from the email that Misenheimer was dissatisfied with the department's inability to meet its quota. (*Id*. at 104).

Misenheimer sent plaintiff a memorandum dated August 27, 2007, outlining problems in the department that were of concern to Misenheimer and advising plaintiff that he was being placed on a 120-day performance probation due to failure to meet the goals of the program. (*Id*., Exh. 6).  On September 4, 2007, Misenheimer sent plaintiff an email criticizing his performance and stating that he was "looking at making changes and weighing all of my options." (*Id*., Exh. 7).  Three days later, on September 7, 2007, Misenheimer sent an email to all three members of the management team stating he was disappointed that the department continued to struggle with

the lack of production and informing the team that "[a]s a result I am going to be implementing some changes in the near future." (*Id*., Exh. 8.).

In November 2007, Misenheimer requested that C-HCCAA reorganize the management team in Weatherization. (Robinson Aff. at ¶ 12). On November 30, 2007, Misenheimer had a conversation with plaintiff about a change in plaintiff's job responsibilities. (*Id*. at 157-158). According to plaintiff, Misenheimer informed him that he wanted plaintiff to do more intake/outreach and Misenheimer had hired someone to supervise the staff. (*Id*. at 157). Plaintiff told Misenheimer that this was a demotion; he had not received anything from Human Resources with regard to the change; and he did not accept the demotion. (*Id*. at 158). When plaintiff returned to his office, there was a letter from Misenheimer advising him that effective December 3, 2007, his new role would be Intake/Outreach Specialist and his new hourly rate would be $15.43.[3] (*Id*., Exh. 11). The letter stated that Weatherization was over 50 units behind in meeting its production goals and listed other problems which had precluded the department from staying on schedule with production. (*Id*.). The letter advised Key that Misenheimer had been given full authority to reorganize the department's operations to meet its goals. (*Id*.). Plaintiff understood he was not being fired from the department and his new position, if he accepted it, would be Intake/Outreach Specialist. (*Id*. at 158-159).

The following Monday, plaintiff reported to work and reviewed files and finalized business in his role as Operations Manager. (*Id*. at 175-176). Dudley spoke with plaintiff on

---

[3]Key had a 40-hour workweek. (Key depo. at 155). His annual salary as Operations Manager was $33,280. (*See id*. at 154).

December 5, 2007, about the demotion.  (*Id*. at 177-178).  Plaintiff received a letter on or about

that date offering him the position of Intake/Outreach Specialist at the hourly rate of $15.43.  (*Id*.,

Exh. 12).  The letter included a signature line for plaintiff to indicate his assent.  (*Id*.)  After

speaking with Dudley on December 5, plaintiff took a few weeks of vacation time he had

accumulated.  (*Id*. at 183-184).  When he returned, he met with Dudley and Misenheimer on

December 27, 2007.  (*Id*. at 188-189).  At the meeting, plaintiff wrote on the letter offering him

the Intake/Outreach Specialist position that he did "not accept this position which is a demotion

without reason," and he signed and dated the letter December 27, 2007.  (*Id*. at 190, Exh. 12).

Dudley informed plaintiff that they could discuss on the following Monday the possibility of

plaintiff applying for a position in another department where he had previously worked.  (*Id*. at

189).

Plaintiff returned to work on January 3, 2008.  (*Id*. at 185-188).  He was placed on

administrative suspension that same day.  (*Id*., Exh. 14).  The Disciplinary Action Notice stated

that he had been offered an Outreach/Intake Specialist position as of December 5, 2007, due to a

reorganization of the department; he had not accepted the position; he was being placed on

administrative suspension effective January 3, 2008, at 1:15 p.m. until his employment status

with the Agency was resolved; and he would be notified by the close of business on January 9,

2008, as to the status of his employment with the Agency.  (*Id*.).  Plaintiff had a telephone

conversation with Dudley about the suspension.  (*Id*. at 263).  Following this conversation,

plaintiff received a letter from Dudley dated January 10, 2008.  (*Id*. at 206-207, Exh. 15).  The

letter stated that his position as Operations Manager had been discontinued; plaintiff had

received a second notification of this change on December 5, 2007, and was offered an

7

Intake/Outreach Specialist position with a minimum pay decrease; on December 27, 2007, plaintiff had responded to the December 5, 2007 notification by indicating he was not interested in that position; plaintiff was asked at that time if there was another position within the Agency he would be interested in; he had declined to apply for another position; and C-HCCAA therefore accepted his resignation effective January 10, 2008. (*Id.*, Exh. 15). Plaintiff disputes that he had declined to apply for another position. He testified at his deposition that he wanted to apply for a position but was precluded from doing so because he was suspended before he had the opportunity to speak with Dudley about other available positions. (*Id.* at 208-209).

As part of the reorganization, C-HCCAA removed Reed from the management team and reassigned him to his previous position as Inspector, which he accepted. (Robinson Aff. at ¶ 14). C-HCCAA terminated Washington. (*Id.* at ¶ 15). C-HCCAA hired Lynette Alexander, an African-American woman who was 46 years old in 2008, as Weatherization's Administrative Manager. (*Id.* at ¶ 16). C-HCCAA also hired an African-American male over the age of 40 to join the management team in the Weatherization department as Production Manager. (*Id.* at ¶ 19).

### III. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may grant summary judgment as a matter of law only when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)

8

(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of

the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Id*. at

255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).  However, a district court

need not view the facts in the light most favorable to the nonmoving party if that party's version

of events is "blatantly contradicted by the record, so that no reasonable jury could believe it."

*Scott v. Harris*, 550 U.S. 372, 380 (2007).

        The court is not to weigh the evidence and determine the truth of the matter but is to

decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine

issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party.  *Id*. (citing *Cities Serv.*, 391 U.S. at 288-289).  If the evidence is merely

colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative,

*Cities Serv.*, 391 U.S. at 290, judgment may be granted.  *Anderson*, 477 U.S. at 249.

### IV.  Motion for Summary Judgment

        Defendant contends it is entitled to summary judgment on plaintiff's race, gender and age

discrimination claims because plaintiff cannot satisfy the requirements of a prima facie case.

Defendant contends that plaintiff was not qualified for his position; plaintiff was not replaced by

an individual outside the protected classes; and plaintiff was not treated less favorably than a

similarly situated individual outside the protected classes.  Defendant further contends that the

record shows plaintiff was reassigned for the legitimate, nondiscriminatory reason that his poor

performance was contributing to the Weatherization department's declining production numbers,

and plaintiff was terminated for the legitimate, nondiscriminatory reason that he did not accept

the new position offered him or apply for an alternative position.  Defendant contends it is

entitled to summary judgment on plaintiff's retaliation claim because he cannot establish the

essential elements of his claim, and defendant has demonstrated legitimate, nondiscriminatory reasons for its actions. Finally, defendant contends that plaintiff's hostile work environment claim must be dismissed because plaintiff has offered no evidence of harassing, intimidating or hostile behavior based on a protected class.

## V. Opinion

### A. Race, Gender and Age Discrimination Claims

The same evidentiary framework applies to discrimination claims brought under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000, et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). A plaintiff may establish a discrimination claim by either direct or circumstantial evidence. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

In an age discrimination case, whether a plaintiff seeks to prove his case by direct or circumstantial evidence, he has the burden of persuasion to demonstrate "that age was the 'but-for' cause of his employer's adverse action." *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Gross v. FBL Fin. Services, Inc.*, 129 S.Ct. 2343, 2351 n.4 (2009)). Where a plaintiff seeks to establish his age discrimination claim by circumstantial evidence, the claim may be analyzed under the framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 (1973). *See Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264

n.2 (6th Cir. 2010) (citing *Geiger*, 579 F.3d at 622).

A plaintiff who lacks direct evidence of discrimination may establish a prima facie case of discrimination through circumstantial evidence by showing that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position lost or not gained; and 4) he was replaced by an individual outside the protected class. *Mitchell*, 964 F.2d at 582. The fourth prong is modified for an age discrimination claim to require replacement by a "substantially" or "significantly" younger person, which may include an individual within the protected class. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313 (1996); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

Plaintiff may also establish the fourth prong of a prima facie case of discrimination by showing that he was treated less favorably than a similarly-situated individual outside the protected class. *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). If the plaintiff seeks to establish that he was treated less favorably than a similarly-situated individual, he must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons but were a pretext for discrimination. *Id.* at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of pretext

11

showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343 (2009). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, *i.e.*, the reason is factually false. *Id*. The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id*. If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id*. For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, the plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. *Id*.

The Sixth Circuit has cautioned that *Manzer's* three-part test is not to be applied in a formalistic manner. *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Rather, the court must bear in mind that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id*. The court must ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong the

evidence is. *Id.* The Sixth Circuit in *Chen* explained,

> At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000). ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id.*

A plaintiff must allege more than a dispute over the facts upon which his discharge was based in order to establish pretext. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001). He must put forth evidence which demonstrates the employer did not "honestly believe" in the proffered nondiscriminatory reason for its adverse employment action. *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). An employer has an honest belief in its nondiscriminatory reason for discharging the employee "where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Chrysler Corp.*, 155 F.3d at 807).

One way for the plaintiff to demonstrate pretext is to show that the "asserted business judgment was so ridden with error that defendant could not honestly have relied upon it." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (citing *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988)). The court may not substitute its judgment for that of the employer but must simply evaluate "whether the employer gave an honest explanation of its

behavior." *Hedrick v. Western Reserve Care System,* 355 F.3d 444, 462 (6th Cir. 2004) (citations omitted).

Here, plaintiff claims that he was qualified for the Operations Manager position; he was subjected to an adverse employment action by being demoted to a position two grades below that position and then terminated when he refused to accept the demotion; he was replaced by a less qualified female, who was hired into a position comparable to the Operations Manager position; and a similarly-situated, substantially younger white male employee, William Reed, was treated more favorably than plaintiff by being offered a position which was only one grade below the management position he held.

Defendant does not dispute that plaintiff has established the first two prongs of a prima facie case of age, gender and race discrimination by showing that he is a member of the protected classes, and he suffered an adverse employment action by being demoted to a lower paying non-managerial position. However, defendant claims that plaintiff cannot satisfy the third prong of a prima facie case of race, gender or age discrimination because he was not qualified for the Operations Manager position at the time he was demoted.

Defendant also disputes that Key was replaced by Lynette Alexander, the individual who was hired for the position of "Administrative Manager" in the Weatherization department. Defendant claims this is a different position from Operations Manager and requires the performance of numerous administrative functions that plaintiff was not required to perform as the department's Operations Manager. (Doc. 30 at 3; Robinson Aff. at ¶ 18).

Defendant further denies that plaintiff was treated less favorably than Reed. Defendant claims that plaintiff and Reed were treated in the same manner because both were offered reassignment to the non-management positions they had held before being promoted to

management positions in Weatherization, and both were offered a 5% reduction in their salaries to correspond with the changes in their positions. (*Id*. at 5, citing Key depo. at 154-155, 188-189; Key depo. Exhs. 11, 12; Robinson Aff. at ¶¶13-14; Doc. 30-1, Robinson Aff. at ¶¶ 4-7). Defendant alleges that in contrast to Reed, plaintiff voluntary chose not to accept an alternate position or to apply for another position, leading defendant to conclude he had voluntarily resigned. (*Id*. at 6, citing Key depo. at 157-158, 188-190; 206-208; Exh. 15).

Defendant argues that for these reasons, plaintiff is unable to establish a prima facie case of race, gender or age discrimination. Defendant contends that even if plaintiff could make out a prima facie case of discrimination, he makes no attempt to show that defendant's legitimate, nondiscriminatory reasons for his demotion and termination were pretextual.

### i. The Third Prong of a Prima Facie Case of Race, Gender and Age Discrimination is Satisfied

At the prima facie stage, the court reviews a plaintiff's objective qualifications to determine whether the plaintiff was qualified for the position in question. *Wexler*, 317 F.3d at 575. Objective qualifications may include education, experience in the industry, and required general skills (*Id*.), as well as an individual's prior work history. *Cicero*, 280 F.3d at 586. The plaintiff may demonstrate he was qualified for a position by presenting credible evidence that his qualifications were at least equivalent to the minimum required for employment in the field. *Wexler*, 317 F.3d at 575-76. Generally, a court may not consider the employer's alleged nondiscriminatory reason for the adverse employment action at the prima facie stage but instead must examine the plaintiff's prima facie case independent of the reasons offered by the defendant for the adverse employment decision. *Id*. at 574. *See also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-661 (6th Cir. 2000). The court's consideration of the

15

nondiscriminatory reason offered by the defendant is properly reserved for the second stage of the *McDonnell Douglas* analysis. *Cline,* 206 F.3d at 662.

Here, plaintiff has met his burden of demonstrating he was qualified for the Operations Manager position. Defendant selected plaintiff for the position after plaintiff had been employed by C-HCCAA for several years. Defendant does not point to any objective evidence, such as a lack of education, experience in the industry, or required general skills, to show that plaintiff was not qualified for the position to which it had promoted him. Nor does defendant cite a change of circumstances to show that plaintiff somehow became unqualified for the Operations Manager position. Although defendant now claims that Key did not possess the relevant experience necessary to perform the Operations Manager job because he had never previously held a management position or supervised anyone, defendant obviously did not consider prior management or supervisory experience to be an essential qualification for the job since it presumably was aware of plaintiff's lack of such experience when it promoted him to Operations Manager.

The only other reasons defendant offers to demonstrate that plaintiff was not qualified for the Operations Manager position are the same reasons defendant offers to explain why it removed plaintiff from the position. Defendant claims that plaintiff performed poorly in his role as Operations Manager as evidenced by the extremely negative performance evaluation he received and the numerous suggestions, instructions and directives Misenheimer sent to him. (Doc. 28 at 19-20, citing Key depo. Exhs. 1-10; Key depo. at 79, 86). Defendant further asserts that plaintiff's poor performance contributed to the Agency's continual failure to meet its production numbers. (*Id*. at 20, citing Key depo. Exhs. 4, 11). However, this evidence is appropriately considered at the second stage of the *McDonnell Douglas* analysis, not as part of

the inquiry into plaintiff's qualifications.  Because defendant has not introduced competent evidence that calls plaintiff's qualifications for the Operations Manager position into question, plaintiff has met his burden of showing he was qualified for the position.

### ii.  The Fourth Prong of a Prima Facie Case of Gender Discrimination is Satisfied

Plaintiff seeks to establish the fourth prong of his prima facie case of gender discrimination by showing that he was replaced by Lynette Alexander, a female who was hired into a position comparable to the Operations Manager position.  (*See* Doc. 29 at 7-8; Doc. 29-1, Key Aff. at ¶¶ 16-17).  Defendant denies plaintiff was "replaced" by Alexander because she was hired for a different position with a different job title at C-HCCAA, *i.e.*, Administrative Manager in Weatherization.

Under Sixth Circuit law, the plaintiff is replaced when another individual is hired to perform the plaintiff's duties.  *See Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 265 (6th Cir. 2010) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).  In his affidavit, plaintiff avers that defendant hired Alexander effective December 3, 2008, the same date plaintiff was to be demoted from his position.  Plaintiff also avers that despite the different job titles, Alexander's job duties were the same.  (Key Aff. at ¶¶ 16-17).  Drawing all justifiable inferences from the evidence in plaintiff's favor, the Court must conclude for summary judgment purposes that plaintiff was replaced by a female.  Plaintiff has made out a prima facie case of gender discrimination.

### iii.  The Fourth Prong of a Prima Facie Case of Race and Age Discrimination is Not Satisfied

Plaintiff is unable to establish a prima facie case of age or race discrimination based on his replacement by Alexander who was a 46 year old, African-American.  Plaintiff is also

17

African American and either the same age as or younger than Alexander. (*See* Doc. 3, IV, at ¶4; Doc. 3, V, at ¶5).

Nevertheless, plaintiff contends he was treated less favorably than Reed, a similarly-situated younger Caucasian employee, and therefore satisfies the fourth prong of his prima facie case of race and age discrimination. The Court disagrees.

Plaintiff cannot establish a prima facie case of race or age discrimination based on dissimilar treatment because the evidence shows that he was treated the same as a similarly situated individual outside these protected classes. Plaintiff claims that Billy Reed, a substantially younger white manager in the Weatherization department, was treated more favorably than plaintiff and the only other African-American manager in Weatherization, Donnie Washington. Plaintiff claims defendant retained Reed while terminating plaintiff and Washington.

Plaintiff states that although both he and Reed were offered positions they had formerly held, plaintiff's former position of Intake/Outreach Specialist was two grades below the position of Operations Manager (presumably because plaintiff held the title of Energy Educator, an hourly non-management job, before being promoted to Operations Manager).[4] (*See* Key Depo. at 68). Plaintiff claims that in contrast, Reed's position was just below his management position, so the consequences of Reed's demotion were not as "economically severe" as those of plaintiff's demotion or of Washington's termination. (Doc. 29 at 8). Plaintiff does not dispute, however, that he and Reed were both offered jobs they formerly held at a 5% salary reduction following their removal from their management positions (Doc. 30-1, Robinson Aff. at ¶¶ 3-7),

---

[4] Key states that he was promoted to the position of Energy Auditor/Educator in 2005. (Key Aff. at ¶ 6).

and he does not allege that they had earned different salaries as managers. Thus, Reed and

plaintiff were treated similarly in all essential respects in that both were removed from their

management positions; both were offered non-management hourly positions which they

formerly held at a 5% reduction in their managers' salaries; and there is no evidence that the

terms of the offer made to Reed were economically or otherwise more favorable than the terms

of the offer made to plaintiff. For these reasons, plaintiff has failed to show that he was treated

less favorably than Reed so as to establish the fourth prong of a prima facie case of race or age

discrimination.

### iv. Plaintiff Has Not Established a Prima Facie Case of Failure to Transfer

Plaintiff also claims that C-HCCAA discriminated against him by denying him the

opportunity to transfer to another position in HEAP instead of terminating him.[5]  Plaintiff

alleges that Dudley advised him that a managerial position was available in the HEAP

department; he did not apply for the position "through no fault" of his own; and upon

information and belief, the Agency continued to seek applicants for the position after plaintiff

had expressed an interest in it. (Doc. 29 at 10; Key Aff. at ¶ 15).

In order to establish a prima facie case of  discrimination based on a failure to transfer,

plaintiff must show that: (1) he was a member of a protected class; (2) at the time of his

termination he was qualified for other available positions with the defendant; (3) the employer

did not offer such positions to him; and (4) a similarly situated employee who is not a member

of the protected class was offered the opportunity to transfer to an available position, or there is

---

[5]Plaintiff frames his claim that he was not chosen for a managerial position in HEAP as a "failure to hire" claim. (Doc. 29 at 10). However, the claim is properly construed as a claim that defendant discriminated against plaintiff by terminating him instead of transferring him to another position for which he was qualified. Accordingly, the Court will analyze the claim under a failure to transfer framework.

other direct or circumstantial evidence supporting an inference of discrimination. *Myers v. U.S. Cellular Corp.*, 257 F. A'ppx 947, 953-954 (6th Cir. 2007) (citing *Ercegovich*, 154 F.3d at 351).

Plaintiff has not produced evidence that a similarly situated employee outside the protected classes was given the opportunity to transfer to a managerial position in HEAP, or to any other available position, while plaintiff was denied such an opportunity.  Plaintiff admits that both he and Reed, a substantially younger white manager, were offered the opportunity to transfer to positions they had previously held at a 5% reduction in pay.  Plaintiff does not identify another position that was available to which he could have transferred, and he has not produced any evidence that defendant offered another employee outside the protected class the opportunity to transfer to that position or that defendant continued to seek applicants for that position as plaintiff alleges.[6]  Plaintiff's vague allegations that he was denied the opportunity to transfer to a managerial position that was purportedly available in HEAP are insufficient to establish the prima facie elements of a failure to transfer claim. *See Mitchell*, 964 F.2d at 585 (conclusory and subjective allegations are "wholly insufficient evidence to establish a discrimination claim as a matter of law.").  Therefore, plaintiff has failed to establish a prima facie case of failure to transfer.

### v. Plaintiff Has Not Established Pretext

Defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's

---

[6]Plaintiff suggests at ¶ 15 of his affidavit that defendant failed to consider him for the "Operations Administrator" position that was filled by Alexander, even though he had expressed an interest in the position and was clearly qualified for it.  However, plaintiff also claims that the Operations Administrator and Operations Manager positions were the same, even though the titles were different, and that he "was discriminated against when [he] was *replaced* by [Alexander.]" (Key Aff. at ¶¶ 16-17) (emphasis added).  If Alexander was hired as plaintiff's "replacement" as he now argues, he cannot legitimately claim that he should have been considered for the position from which he had just been demoted.  Plaintiff cannot establish a failure to transfer claim by showing that defendant failed to return him to his previous position.

termination. Defendant claims it removed plaintiff from the Operations Manager position because of his poor performance, which contributed to the Agency's continual failure to meet its required production numbers. (Doc. 28 at 21-25). Defendant contends it terminated plaintiff because he declined its offer to remain employed at his former position of Intake/Outreach Specialist and he failed to apply for another position. (*Id*. at 25, 27). Defendant asserts that plaintiff has produced no evidence to show that its articulated reason is false and was a pretext for intentional discrimination because of race, gender or age.

The Court finds that plaintiff has not produced sufficient evidence to allow a jury to reasonably doubt defendant's explanation for his demotion and termination and to find that the adverse actions were a pretext for unlawful discrimination. *See Chen*, 580 F.3d at 400 n.4. Though plaintiff contends his March 2007 performance evaluation assessed his goal achievement as average and showed he improved the Weatherization department in the absence of the Weatherization Director (Misenheimer), the evaluation actually stated that plaintiff displayed average effort toward meeting goals and took initiative to improve matters during the absence of department leadership. (Key depo. Exh. 1). Contrary to plaintiff's representation, the evaluation does not show plaintiff was achieving the Agency's production goals. Plaintiff also alleges that Misenheimer did not have a sound basis for challenging plaintiff's method for elevating production numbers and that defendant had no objective criteria with regard to demotions. These allegations are not sufficient to call into doubt the legitimacy of defendant's reasons for demoting and terminating plaintiff. Plaintiff's performance evaluation and Misenheimer's communications with plaintiff document repeated deficiencies in plaintiff's performance and an inability of plaintiff and the other members of the Weatherization department to generate sufficient applications to satisfy the state-mandated production numbers.

21

Plaintiff has simply not produced any evidence which shows that the Weatherization department was in fact meeting its production numbers.

Nor has plaintiff produced evidence creating an issue of fact as to whether Misenheimer's criticisms were a pretext for discrimination. Plaintiff has not presented any evidence indicating that Misenheimer singled plaintiff out to be demoted based on his age, race or gender. To the contrary, plaintiff admits that Misenheimer, who supervised all three managers in the Weatherization department, made adverse employment decisions as to each of the managers. (Doc. 29 at 8-9).

Finally, plaintiff disputes defendant's assertion that plaintiff declined to apply for another position. (Key depo. at 208-210). Plaintiff testified that Dudley was to advise him of the available positions in HEAP for which he could apply the Monday after the December 27, 2007 meeting. However, plaintiff was suspended before he had an opportunity to speak with Dudley. (*Id*. at 209-211). Yet, as discussed above, plaintiff has failed to produce any evidence that a position actually was available in HEAP. Accordingly, whether plaintiff was foreclosed from speaking with Dudley about a position in HEAP is not material to the question of whether defendant's decision to terminate plaintiff after he refused the offer of Intake/Outreach Specialist was a pretext for race, gender or age discrimination.

Plaintiff has therefore failed to produce evidence to demonstrate that the reasons articulated by defendant for his discharge are pretextual. Accordingly, defendant should be granted summary judgment on plaintiff's race, age and gender discrimination claims brought under federal law.

22

**B. Retaliation Claim**

Defendant claims that plaintiff is unable to establish the essential elements of a retaliation claim. Defendant alleges that plaintiff filed the EEOC charge complaining of his demotion on December 28, 2007, which was one month after Misenheimer had spoken with plaintiff on November 30, 2007, to inform him about the demotion. (Doc. 30 at 11, citing Doc. 30-1, Robinson Aff. at ¶ 9; Key depo. at 157-159). Thus, defendant argues there can be no causal connection between plaintiff's filing of the charge and his demotion.

Plaintiff claims that defendant is not entitled to summary judgment on his retaliation claim because he filed a discrimination complaint with the EEOC, and he was demoted approximately two days later. Plaintiff claims that the proximity between the filing of charges and an adverse employment action is persuasive evidence of retaliation.

To prove a claim of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) the exercise of his civil rights was known by defendant; (3) defendant thereafter took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Ford v. Gen. Motors Co.,* 305 F.3d 545, 552-53 (6th Cir. 2002).

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had plaintiff not filed a discrimination charge. *Id.* Evidence that the defendant treated the plaintiff differently from similarly situated employees is relevant to causation. *Id.* (citing *Moon v. Transp. Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir. 1987)). Once the plaintiff establishes a prima facie case of retaliation, the burden is on the defendant to articulate a legitimate reason for the adverse action,

23

which plaintiff may rebut by producing credible evidence of pretext. *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.,* 783 F.2d 50, 54 (6th Cir. 1986).

Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact on his retaliation claim. Plaintiff claims there is "clear evidence that [he] actually advised his supervisor Misenheimer that he filed a discrimination complaint against his employer with [the] EEOC alleging race discrimination, and other protected classes." (Doc. 29 at 10). However, the only EEOC charge in the record is a discrimination charge plaintiff filed with the EEOC on December 28, 2007, complaining of his demotion and reassignment to the Intake/Outreach Specialist position. (Doc. 30-1, Att. A). Assuming plaintiff filed a charge prior to his demotion, he has neither disclosed the nature of the charge nor offered any evidence to show that Misenheimer was aware he had filed an EEOC charge prior to his demotion.

Plaintiff has also failed to produce sufficient evidence to show that he was demoted in retaliation for filing an EEOC charge. The evidence shows that as early as July of 2007, Misenheimer had warned plaintiff and the other managers in Weatherization of impending departmental changes in light of the department's failure to meet state-mandated production numbers (Key depo., Exhs. 4, 7), and Misenheimer demoted or terminated all three managers rather than singling out plaintiff for adverse treatment. Finally, plaintiff has failed to point to any evidence showing that Misenheimer subjected him to severe or pervasive harassment subsequent to November 28, 2007, as plaintiff alleges.[7]  Accordingly, plaintiff has failed to produce evidence to establish the essential elements of a retaliation claim. Defendant should be

---

[7]Plaintiff suggests that he was subjected to retaliatory harassment because he "made it known to Misenheimer that he thought there was discriminatory treatment in the employment of Reed." (Doc. 29 at 11). However, plaintiff does not explain this assertion and offers no evidence to support it. Therefore, the Court will not address this contention.

24

granted summary judgment on this claim.

## C. Hostile Environment Claim

Plaintiff alleges that Misenheimer subjected him to a hostile environment by (1) sending him condescending emails, and (2) refusing to converse with him face to face while conversing with Reed face to face, thereby impeding employee morale; precluding plaintiff from addressing matters promptly; and affecting the efficient operation of the Weatherization department.

Defendant contends it is entitled to summary judgment on plaintiff's hostile environment claim because under Sixth Circuit law, ignoring an employee and criticizing an employee's work is not severe and pervasive conduct that would rise to the level of a hostile work environment. (Doc. 30 at 13, citing *Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003) (and other cases)).

Discrimination that is "sufficiently 'severe or pervasive' to 'alter the conditions of [the victim's] employment and create an abusive working environment'" is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To establish a prima facie hostile environment case, plaintiff must establish that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his race, age or gender, (4) the harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive, or intimidating work environment, and (5) there is employer liability. *See Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). *See also Crawford v. Medina General Hosp.*, 96 F.3d 830, 834-835 (6th Cir. 1996). To satisfy the fourth prong, plaintiff must show that the conduct to which he was subjected was sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and

25

that he subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658-59 (6th Cir. 1999)).

Defendant should be granted summary judgment on plaintiff's hostile environment claim. Plaintiff does not allege that Misenheimer subjected him to harassment based on his race, age or gender. Nor does plaintiff describe conduct by Misenheimer which a reasonable person would find hostile or abusive. While plaintiff may have felt that Misenheimer's reliance on email as a method of communicating was impersonal, disrespectful, and inefficient, Misenheimer did not violate plaintiff's rights under the anti-discrimination laws by conducting business in this manner.

**D. State Claims**

Plaintiff alleges in the complaint that he is bringing state claims under the Court's supplemental jurisdiction. (Doc. 3, §§ I, II). Pursuant to 28 U.S.C. § 1367, the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If all federal claims are dismissed before trial, then the state claims should be dismissed as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Accordingly, if defendant C-HCCAA is granted summary judgment on plaintiff's federal claims, then the Court should decline to exercise supplemental jurisdiction over plaintiff's state claims and dismiss those claims without prejudice.

26

## IT IS THEREFORE RECOMMENDED THAT:

1.  Defendant's motion for summary judgment (Doc. 28) be **GRANTED** and judgment be entered in favor of defendant on plaintiff's federal claims.

2.  The Court decline to exercise supplemental jurisdiction over plaintiff's state claims and dismiss those claims without prejudice.

Date: 6/28/2011

Karen L. Litkovitz

United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DANIEL J. KEY,                              Case No. 1:09-cv-139

     Plaintiff                              Spiegel, J.

                                           Litkovitz, M.J.

  vs

CINCINNATI HAMILTON COUNTY
COMMUNITY ACTION AGENCY,
     Defendant

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

28